## Richmond.

PACE v. PACE'S ADM'R & OTHERS.

APRIL 7, 1898.

Absent, Cardwell and Buchanan,* JJ.

1. SUBROGATION—*Decedent's Estate—Debt Paid by Co-Surety—Amount for Which He May Prove.*—The liabilities of the estate of a decedent, and the rights of his creditors, are fixed by his death. If at that time a creditor has the right to prove against his estate a debt for which the decedent and another are bound as sureties, and subsequently the co-surety pays the debt, he is substituted to the right of the creditor, and may prove the whole debt against the estate of the decedent, and receive dividends thereon until one-half of the debt is paid, although the estate of the decedent will not pay his debts in full.

Appeal from a decree of the Corporation Court of the city of Danville, pronounced March 16, 1896, in a suit in chancery wherein John R. Pace's administrator and others were the complainants, and Sallie A. Pace and others were the defendants, in which suit appellant proved his debt.

*Reversed.*

The opinion states the case.

*Christian & Christian,* for the appellant.

*E. E. Bouldin* and *Geo. C. Cabell,* for the appellees.

HARRISON, J., delivered the opinion of the court.

The facts of this case in brief are that on April 7, 1893, one T. J. Talbott (under the name of Pace, Talbott & Co.), John R.

---

* Judge Buchanan was interested in the question involved.

Pace and James B. Pace, made a note for sixteen thousand dollars, payable to William F. Cheek, or order, one hundred and twenty days after date. T. J. Talbott was the principal in the note, and John R. Pace and James B. Pace co-sureties. T. J. Talbott died in the fall of 1894 entirely insolvent. Prior to his death, to-wit: On October 9, 1893, John R. Pace died leaving an estate not sufficient to pay more than fifty cents on the dollar of his debts. In May, 1894, this suit was brought to administer John R. Pace's estate, and a decree of reference was entered in July, 1894. On the 19th of September, 1895, being pressed by the executors of the creditor, William F. Cheek, James B. Pace took up the note in question by paying $16,-551.57, the entire amount, principal and unpaid interest, to that time. Thereupon James B. Pace tendered proof of these facts to the commissioner in this suit, and claimed to rank in the distribution of John R. Pace's estate for the whole of the debt so paid by him until he had received one-half of· the amount paid by him, but the commissioner reported that he could only rank for one-half the debt, and an exception made by James B. Pace on that ground was overruled by the court below, from which ruling this appeal was taken.

The contention of the appellee is that J. B. Pace could not rank against the estate of his co-surety for the whole debt when the co-surety only owed him one-half of the debt. In other words, that appellant had no right to prove for the one-half of the debt which he himself was primarily bound to pay.

The question presented is an important one in the administration of insolvent estates, and there is some conflict of opinion in respect thereto. We are, however, satisfied that the view taken by the learned counsel for the appellant is sustained by the best reason, and the weight of authority.

In *Enders* v. *Brune*, 4 Rand. 447, Judge Carr, in discussing the doctrine of substitution, says: "It has nothing of form, nothing of technicality about it; and he who, in administering it, would stick in the letter, forgets the end of its creation, and per-

verts the spirit which gave it birth.    It is the creature of equity and real essential justice is its object."

The doctrine is well settled that the surety has the right of substitution against the estate of his principal, where payment of a preferred debt has been made by such surety after the death of the principal, and the rule of substitution for the purpose of enforcing contribution among co-sureties is not different. One surety who pays the common debt is entitled to be subrogated to all the rights and remedies of the creditor, as against his co-sureties, in precisely the same manner as against the principal debtor.    *Robertson* v. *Trigg*, 32 Gratt. 76; *Dering* v. *Earl of Winchelsea*, 1 Leading Cases in Equity (3rd Amer. Ed., p. 131) and notes.

In *Ex parte Stokes*, De Gex, 618, Stokes, the creditor, held a bond executed by a principal and three sureties.    Two of the sureties, Clark and Phillips, became bankrupts, and Stokes, the creditor, proved against their estates.    Thereafter the principal debtor compounded with his creditors; and the other surety, Thomas Charles Ord, executed an assignment for the benefit of his.    Stokes, the creditor, by dividends received from the principal debtor, from the estate of Clark, one of the sureties, and from Thomas Charles Ord, realized his whole debt, to the payment whereof the remaining surety, Phillips, contributed nothing.    The creditor realized from the estate of Thomas Charles Ord 10s. in the pound, whereas the just proportion payable by each surety was only 4s. 10d. in the pound.    Thereupon the assignees of Thomas Charles Ord petitioned for leave to stand in the place of the creditor for his entire debt as against the estate of Phillips, which had paid nothing, so as to realize from that estate its just proportion, viz.: 4s. 10d. in the pound. The petition was allowed, Sir J. L. Knight Bruce saying:

"The question then substantially is whether, as between the estates of the two sureties, when (one of them having become bankrupt) the creditor has proved the debt under the fiat, and has afterwards been paid in full, partly by the principal debtor

and. partly by the surety, not a bankrupt—the latter has the right to use the proof for the purpose of obtaining from the bankrupt's estate that amount of contribution to which the bankrupt is, or but for the bankruptcy would have been liable, so far as the proof can furnish means for that end; and I think that he has.

"Where several persons are liable, each *in solido*, to a debt, the creditor may enforce payment in a manner which, as between the debtors themselves, is unjust. This must sometimes happen; but in such cases is it not the function and the duty of a court of justice, at least of a court of equity, to place them in the same situation between themselves, as if the creditor had enforced his rights against them in a manner conformable to their rights against each other, so far as it can be done? Generally speaking, the law of this country, as I apprehend, answers that question in the affirmative.

"Now, in the present case, had Mr. Stokes regulated his proceeding in such a manner, a portion of what he has received from Mr. Thomas Charles Ord's estate would have been taken by Mr. Stokes from Mr. Phillip's estate, if available, for the purpose. The mere circumstance that it has not until the present time become practically available for the purpose, is, I conceive, nothing.

"This has not been done; but justice requires, I apprehend,. that the nearest possible approach to that state of things shall take place, which must, I suppose, be effected by allowing the claim intended to be made by the present petition. Mr. Clark's estate, unless I mistake, has paid 5s. in the pound, but not more; while I collect, that Mr. Thomas Charles Ord's estate has paid 10s. in the pound, and Mr. Phillip's estate as yet nothing. * * *

"I repeat, that it was orignally equitable between these sureties, or their estates, that the benefit of the proof of some portion of it should go in diminution of Mr. Thomas Charles Ord's burden; that, in my view, it was not competent to Mr. Stokes, by any election upon his part, to deprive Mr. Thomas,

Charles Ord's estate of that right; that it could not, I think, be defeated by delays and difficulties occurring in the liquidation or collection of Mr. Phillip's assets, and that the right appears to me substantially to have continued, and now to exist."

In the case of *Morgan* v. *Hill*, 3 Law. Rep. Ch. Div. (1894) 400, a debt was owing by a principal debtor and five sureties. Nothing could be realized from the principal debtor, or from one of the sureties, and only a very insignificant sum from another of the sureties. So three of the sureties were left to bear the liability. One of these three made an assignment, which, after the payment of specified prior claims, provided for the payment of his remaining debts ratably. The creditor presented his claim for payment to the trustees in the assignment, but before the trustees paid anything thereon, the debt was paid by the other two sureties, who subsequently also took from the creditor an assignment of his debt and securities. These two sureties then claimed the right to receive a dividend from the assigned estate of their co-surety on the whole amount of the debt paid by them, until they had received one-third thereof, that being the just proportion payable by each surety. And this claim was allowed by Kekewich, J., and on appeal his order was affirmed.

Kekewich, J., who decided the case in the lower court, said: "Two out of three sureties paid the whole debt, and having so done, they are entitled to stand in the shoes of the creditor whose whole debt they have paid. That would seem to be according to natural justice; but whether it be so or not, at all events it is strictly in accordance with the provisions of the Mercantile Law Amendment Act, 1856 (19 and 20 Vict. c. 97.)

"A surety in such case is to stand in the place of the creditor, and to use all the remedies, and if, need be, and upon a proper indemnity, to use the name of the creditor in any action to obtain indemnification."

The reference of the learned judge to the "Mercantile Law Amendment Act" as justifying his conclusion, if not justified by

its conformity to "natural justice," is a circumstance that does not detract from the weight of this case as an authority in this State, because that act was passed to do away with the doctrine laid down in *Copis* v. *Middleton*, which was disapproved by this court in *Powell* v. *White*, 11 Leigh 309, in a learned opinion by Judge Tucker, and the act referred to simply declared the law in England to be what it had theretofore been under our decisions.

In *Hess's Estate*, 69 Penn. St. 272, the precise question involved here was presented, and the Supreme Court of Pennsylvania held that the surety paying the debt, after the death of his co-surety, was entitled to prove against his estate for the entire amount of the debt.    The court says:

"The debts paid by Christian Lintner and transferred to him stand exactly in the same position to the assets of the decedent, Henry Hess, as if presented by the creditors themselves; their status being fixed by his death, and nothing having occurred to change or reduce the amount.    So far as they existed as debts payable out of the estate, no part of them is paid or extinguished, for the effect of subrogation is to consider them in full life, and enjoying all the rights of the original creditors."

"We regard the administrators of the decedent as trustees, and the creditors as *cestui que trust*, owners of their share of the assets, and which, applying the principle in *Miller's Appeal*, 11 Casey, 481, and *Patten's Appeal*, 9 Wright 161, passed to the co-surety who stepped into their shoes when he paid the amount due on such claims."

In the case of *Miller's Appeal*, 35 Penn. St. 481, an insolvent debtor had executed a general assignment for the benefit of all his creditors.    Subsequently the assignor became entitled to a legacy which was attached by one of the creditors; and from that attachment he realized a portion of his debt.    It was held that such creditor was, notwithstanding, entitled to a dividend of the assigned estate on the whole amount of his claim as it stood at the time the assignment was made.

In this case Judge Strong, afterwards of the Supreme Court of the United States, said: "By the deed of assignment, the equitable ownership of all the assigned property passed to the creditors. They became joint proprietors, and each creditor owned such a proportionate part of the whole as the debt due to him was of the aggregate of the debts. The extent of his interest was fixed by the deed of trust. It was indeed only equitable, but whatever it was, he took it under the deed, and it was only as a part owner that he had any standing in court when the distribution came to be made. * * * * It amounts to very little to argue that Miller's recovery of the legacy operated with precisely the same effect as if voluntary payment had been made by the assignor after the assignment; that is, that it *extinguished* the debt to the amount recovered. No doubt it did; but it is not as creditor that he is entitled to the distributive share of the trust fund. His rights are those of an owner, by virtue of the deed of assignment. The amount of the debt due to him is important only so far as it determines the question of his ownership. The reduction of that debt, therefore, after creation of the trust, and after his ownership had become fixed, it would seem must be immaterial."

There are many cases holding that where a creditor of an insolvent person who is dead, or has made an assignment for the general benefit of creditors, holds collateral security for his debt, and after the death, or the assignment, of his debtor realizes on the collaterals, he may, notwithstanding, prove against the decedent's estate, or the assigned estate for the full amount of his debt as it stood at the time of his death, or assignment. The grounds upon which these cases proceed are ably set forth in the opinion of Judge Taft in *Chemical National Bank* v. *Armstrong*, 59 Fed. 380—8 C. C. Ap. 163—in which he reviews all the authorities.

The only case involving the question here presented, cited by appellee, is that of *New Bedford Institution for Savings* v. *Hathaway*, 134 Mass. 69. In this case the holder of a note, by

an arrangement with a solvent surety thereon, proved the note
against the insolvent estate of another surety, and then assigned
the note with his claim against the estate to the solvent surety
who paid the holder in full.   The court held that this amounted
to a payment of the note, ordered the proof to be expunged, and
only allowed the surety to prove one-half of the claim.   In this
conclusion we cannot concur.   There are three authorities cited
in its support which are not in our judgment entitled to the
weight given them.   The one chiefly relied on is *Maxwell* v.
*Heron*, a Scotch case which, if applicable, has been overruled in
England, and the law there settled, as we have seen, to the con-
trary.

It further appears that the decisions of the Massachusetts
Court, upon analogous questions, have not been in accord with
the views of this and other courts upon like questions.

An important, if not vital, objection to the Massachusetts
view of this question is that the rights of the surety, instead
of being fixed and certain, are made to depend upon accident, or
upon the caprice of the creditor.   It encourages a policy of ob-
struction in the administration of estates, for if those interested
in the insolvent estate can delay its settlement until the creditor
demands his debt from the solvent surety, they reap the advan-
tage by having a smaller debt to share with them in its distribu-
tion.   On the other hand, temptation is held out for a corres-
ponding effort on the part of the solvent surety to avoid paying
until the creditor has received such dividends as the insolvent
estate will pay, because the amount for which he is liable is
thereby reduced.   It gives opportunity to the creditor by collu-
sion or otherwise to further the interest of one surety at the ex-
pense of the just and equal rights of the co-surety.

Results like these, which depend, not upon the rights of the
parties fixed by law but upon the superior skill of one over the
other in manoeuvring for position, or upon the will and caprice
of the creditor, or upon mere accident, cannot be founded upon
sound principles.

In *Watts* v. *Kinney*, 3 Leigh 272, Judge Tucker, speaking for this court, says that the surety, in paying the debt, "is governed by the law of this court. Even on entering into his engagement as surety, he looks to its well established principles. He knows, if he pays the debt to the obligee, he will stand in the obligee's shoes. He knows he will be subrogated to all the rights of the obligee, as they subsist at the time he makes his payment. He knows that a court of equity looks not to form. but to substance; that it looks to the debt which is to be paid, not to the hand which may happen to hold it; that the fund charged with its payment shall be so applied, whosoever may be the person entitled; and that it considers a debt as never discharged, until it is discharged by payment to the proper person, and by the proper person. He knows that that court which permits no act of a trustee to prejudice the *cestui que trust* will not permit one who stands in the relation of the creditor or obligee to the surety, to bar him of those rights which the principles of equity have secured to him. He is conscious that his rights do not depend upon the caprice of the creditor, or the whim of an executor, or the sense of right of other creditors, but rest upon the immutable principles of·justice and equity; and, in making his payment, he does it in the confidence that he will be entitled to be indemnified to the full amount to which his creditor could have charged the assets of the principal."

. These considerations bring us, in the case at bar, to the conclusion that John R. Pace's estate and James B. Pace were each bound *in solido* to their common creditor, William F. Cheek, for the entire amount of the debt in question; that at the death of John R. Pace the rights of his creditors became fixed, the assets of the estate passing, as a trust fund, into the hands of his representatives charged with the payment of his debts; that, subject to costs of administration and preferred debts, William F. Cheek then became entitled to an interest in said estate, not then ascertained but capable of being made certain, bearing such proportion to the entire assets as his debt bore to the entire

indebtedness.   That when James B. Pace, the surety, paid this debt he became at once subrogated to all the rights, remedies, and means of payment in respect thereto that were possessed by the creditor, and had the right to prove, as the creditor could have done, the entire debt against the estate of his co-surety, John R. Pace, and to receive dividends upon the basis of the entire debt until reimbursed that half of the common burden belonging to the co-surety.   This conclusion works no injustice to the other creditors of John R. Pace; their rights which became fixed at the death of the debtor remain unimpaired.   They had no interest in that proportion of the assets belonging to William F. Cheek.   That interest was as distinct and separate from theirs as if it had been already segregated and set apart for the benefit of William F. Cheek.   They could not add to, or take from it, while it was the property of Cheek, nor can they do so now that it stands, in equity, as indemnity for the surety who has paid it.

For these reasons the decree appealed from must be reversed, and the cause remanded to be proceeded with in accordance with the views expressed in this opinion.   .   .

*Reversed.*